UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF JAMES LEE
ALEXANDER, JR. *et al.*,

    Plaintiffs,                                    Case No. 14-cv-11612
                                                    Hon. Matthew F. Leitman

v.

RICH MERROW,

    Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT RICH MERROW'S MOTION FOR SUMMARY JUDGMENT (ECF #18)

This case arises from the tragic shooting death of James Lee Alexander ("Alexander"). On January 30, 2012, Defendant Rich Merrow ("Merrow"), then a sergeant with the Wayne County Sherriff's Office, stopped Alexander while he (Alexander) was driving away from a suspected drug house in Detroit. After Alexander initially submitted to questioning, he attempted to flee in his vehicle. Merrow tried to stop Alexander's flight by grabbing the steering wheel of Alexander's car and directing it into a parked vehicle. That effort failed, and Merrow found himself being dragged along the driver's side of Alexander's moving car as Alexander attempted to drive away. While he was being dragged down the street, Merrow pulled out his service weapon and fired two shots into Alexander. Alexander died as a result of his injuries.

In this action, Alexander's estate (the "Estate") claims that Merrow used excessive force when he shot and killed Alexander. (*See* Compl., ECF #1.) Merrow has now moved for summary judgment (the "Motion"). (*See* ECF #18.) For the reasons stated below, the Court **GRANTS** the Motion.

## RELEVANT FACTUAL BACKGROUND

On January 30, 2012, Merrow was parked outside of a suspected drug house on Camden Street in Detroit (the "Camden House"). (*See* Merrow Deposition Tr. at 15-17, ECF #21-1 at 6, Pg. ID 374.) While there, Merrow observed Alexander exit the Camden House and enter a parked car. (*See id.* at 17, ECF #21-1 at 6, Pg. ID 374.) As Alexander drove past him, Merrow observed that Alexander was not wearing a seatbelt, and Merrow also saw Alexander make a turn without using his turn signal. (*See id.* at 18, ECF #21-1 at 7, Pg. ID 375.) Merrow then followed Alexander, activated the lights on his police vehicle, and initiated a traffic stop. (*See id.*)

After Alexander pulled to the side of the road, Merrow approached and asked for Alexander's driver's license. (*See id.* at 18-19, ECF #21-1 at 7, Pg. ID 375.) Alexander provided his license without incident. (*See id.*) Merrow then began to question Alexander about his visit to the Camden House. (*See id.*) Alexander initially told Merrow that he was at the Camden House to visit a friend.

2

(*See id.* at 20, ECF #21-1 at 7, Pg. ID 375.) But Merrow was "not happy with what [he was] hearing." (*Id.*) Merrow "fel[t]" that there was "something more" going on. (*Id.*) Merrow continued to question Alexander, and Alexander eventually admitted that he had previously purchased drugs from a person in the Camden House and that he had visited the house that day to pay off a drug debt. (*See id.* at 21-22, ECF #21-1 at 7-8, Pg. ID 375-76.)

Based on Alexander's admissions, Merrow decided to impound Alexander's vehicle under Wayne County's public nuisance laws. (*See id.* at 22-23, ECF #21-1 at 8, Pg. ID 376.) Alexander exited his car as Merrow began filling out the impound forms. (*See id.* at 25-26, ECF #21-1 at 8-9, Pg. ID 376-77.) Once Merrow completed the impound paperwork, he asked Alexander if there was anything Alexander needed to retrieve from his vehicle. (*See id.* at 26-27, ECF #21-1 at 9, Pg. ID 377.) According to Merrow, Alexander then re-entered his car and initially searched for some personal items. However, Alexander then put the car in drive and attempted to flee:

> So Mr. Alexander steps back into the vehicle completely, the driver's side door is open, and he's going through the glove box, grabbing paperwork. He's fumbling with some paper on the passenger seat as well, and then he looks over at me, and then he takes the door, driver door, and he shuts the door and starts his car simultaneously, and then that's when I [(Merrow)] asked him, 'What are you doing?'

3

> He says 'You can't hold my car. You can't take my car for buying drugs. My wife will divorce me.'
>
> Now I'm telling him, 'It's not worth it. Don't do this. Get out of the car.'
>
> I attempt to open up the driver's door again with my hand from the outside. He slammed it shut again, and again I'm telling him several directives, 'Don't do this. Step out of the vehicle. Get out of the car. Don't do this.'

(*Id. at* 27-28, ECF #21-1 at 9, Pg. ID 377.)

As Alexander began to drive away, Merrow, who was standing next to the driver's side of Alexander's vehicle, tried to open the door to Alexander's car, but Alexander kept "pull[ing] the door shut." (*Id.* at 28, ECF #21-1 at 9, Pg. ID 377.) Merrow then put his hand through the open driver's-side window and grabbed the steering wheel. (*See id.*) Merrow said that he was "hoping that [he could] …keep the steering wheel straight long enough to where [Alexander] would rear-end [a] car [in front of him]." (*Id.* at 28-29, ECF #21-1 at 9, Pg. ID 377.) But Merrow was unable to keep the wheel straight; Alexander forced the wheel to the left and steered the vehicle onto Harper Avenue. (*See id.*) As Alexander continued to drive ahead in the roadway, Merrow lost his footing and began to be dragged along the driver's side of Alexander's car. (*See id.*) At that point, Merrow was afraid to let go of the steering wheel because he worried that if he did so, he would be run over:

> When [Alexander] turn[ed] the steering wheel, I [(Merrow)] wasn't able to keep it straight…So I'm hanging onto the steering wheel as I'm starting to

4

> backpedal, and it's going faster to where – to the point to where I've lost [my] footing. Now my legs and my feet are both being drug on the side of the car.
>
> [....]
>
> I couldn't let go at the time because I was afraid that he was going to run me over. I was on the side of the car and there was no other alternative there. I was scared to death actually.

(*Id. at* 29, ECF #21-1 at 9, Pg. ID 377.)

As Merrow was being dragged along the side of Alexander's car, he drew his weapon and "fired twice" into the vehicle. (*Id.* at 33, ECF #21-1 at 10, Pg. ID 378.) Merrow said he resorted to firing his weapon because, at that moment, he "was being [dragged] on the side of the car and [he] was scared to death that [he] was going to be run over." (*Id.* at 34, ECF #21-1 at 10, Pg. ID 379.) Merrow said that he felt as if he "had no alternative means to stop the vehicle other than shooting [] Alexander." (*Id.*) Merrow explained:

> [M]y initial reaction was I was trying to get him to rear-end the car in front of me. It didn't happen that way. [Alexander] overpowered me, the vehicle moved out there, I lost my footing, and it was too late to go back and try and start over again. That vehicle was dragging me, and the only alternative means I had was to shoot Mr. Alexander to stop the car so I wouldn't get run over.

(*Id.*) After Merrow shot Alexander, he "lost [his] grip falling from the vehicle, and [he] rolled away from the vehicle." (*Id.*)

5

Each of the witness statements in the record confirms Merrow's version of events. For example, police officer Sheri Tanner ("Tanner"), who was seated in Merrow's police car during the incident[1], observed "Merrow being dragged along the side of [Alexander's] car." (Tanner Declaration, ECF #19-4 at ¶7.) She believed that "[b]ased on what she saw … [that] [] Merrow's life was in danger." (*Id.* at ¶9.) Another officer, Jason Matthews ("Matthews") also witnessed the incident. Matthews says that he saw Merrow being dragged by Alexander's car, and that he "feared that [] Merrow would fall and be run over by the car" or that Merrow "would be struck by oncoming traffic." (Matthews Declaration, ECF #19-5 at ¶¶ 5-6.)

Civilian witnesses who saw the incident made similar observations. Civilian Diana Lynn Cann ("Cann") says that she "saw a police officer being dragged down Harper [Avenue] by a car." (Cann Declaration, ECF #19-6 at ¶4.) According to Cann, it appeared to her as if "the officer was going to be run over because he was almost under the car" as it was driving down the street. (*Id.*) Likewise, civilian Witness Jason Davis ("Davis") says that he saw Alexander "pull away from the curb" and take off, "dragging [] Merrow along the side of the car." (Davis Declaration, ECF #19-7 at ¶6.) Davis says that Alexander "appeared to be

---

[1] Tanner remained in Merrow's car and did not participate in the traffic stop because she had "just finished a decoy operation and was not wearing [her] bullet-proof vest." (Tanner Declaration, ECF #19-4 at ¶4.)

heading right at me and I thought he was going to intentionally side-swipe the van I was driving to knock [] Merrow off. Everything seemed to happen in a matter of seconds." (*Id.*) Davis believes that Merrow "was in danger" and "could have been seriously injured or killed." (*Id.* at ¶8.)

## PROCEDURAL HISTORY

On April 23, 2014, the Estate filed this action against Merrow and the County of Wayne (collectively, the "Defendants"). (*See* Compl., ECF #1.) In Count I of the Complaint, the Estate brought numerous state-law claims against the Defendants, including claims for wrongful death, gross negligence, and intentional infliction of emotional distress. (*See id.* at ¶¶ 18-27.) In Count II of the Complaint, the Estate alleged that Merrow violated Alexander's constitutional right to be free from excessive force. (*See id.* at ¶¶ 28-32.) Specifically, the Estate claimed in Count II that Merrow used excessive force when he "intentionally, recklessly, and negligently discharge[d] his firearm," killing Alexander. (*Id.* at ¶15.) Finally, in Count III of the Complaint, the Estate claimed that "the Defendant County of Wayne developed and maintained policies or customs exhibiting deliberate indifference to the Constitutional rights of person in the County of Wayne, which caused the violation of [Alexander's] rights." (*Id.* at ¶37.)

The Defendants moved for summary judgment on December 18, 2015. (*See* the Motion, ECF #18.)  On February 3, 2016, the parties stipulated to dismiss – and the Court did dismiss – all of the Estate's claims against the County of Wayne and all of the Estate's state law claims against Merrow.  (*See* Stipulated Order, ECF #23.)  Thus, the only claim remaining in this action is the claim that Merrow used excessive force when he shot Alexander.  (The Estate has not challenged any of the other actions taken by Merrow, including, for instance, Merrow's initial decision to stop Alexander, Merrow's decision to impound Alexander's car, and/or Merrow's decision to continue his detention of Alexander for additional questioning.)

The Court held a hearing on the Motion on April 13, 2016.

## **GOVERNING LEGAL STANDARD**

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)) (quotations omitted).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*

"The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252.  Summary

judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252. "Credibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

A.   The Court's Two-Pronged Qualified Immunity Analysis

Merrow has moved for summary judgment on the basis of qualified immunity. Under this doctrine, "government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (internal citation omitted).

As the party seeking summary judgment based on qualified immunity, Merrow "bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Once he carries that burden, the Estate, as the Plaintiff in this action, must establish that Merrow is not entitled to qualified immunity. To do so, the Estate must show that (1) "a constitutional right was violated," and (2) "that the right was clearly established at the time of the violation." *Chappell v. City of Cleveland*, 585 F.3d

9

901, 907 (6th Cir. 2009) (internal citations omitted). The Court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**B.     Merrow is Entitled to Qualified Immunity**

Merrow argues that he is entitled to qualified immunity because the undisputed facts establish that, as a matter of law, he did not violate Alexander's Fourth Amendment right to be free from excessive force. (*See* Merrow Br. at 14-17, ECF #18 at 22-25, Pg. ID 100-103.) The Court agrees.

As an initial matter, Merrow has carried his burden of coming forward with facts showing that the challenged action – his decision to discharge his weapon – was a discretionary function. Indeed, there is no real dispute here but that Merrow's decision to fire was a discretionary one. Because Merrow has shown that he was exercising a discretionary function, the Estate must establish, among other things, that Merrow violated Alexander's right to be free from excessive force. It has failed to do so.

A claim that a government actor "used excessive force during the course of a seizure is analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Chappell*, 585 F.3d at 908 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The objective reasonableness analysis "requires a careful balancing of the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The Court must analyze this conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Three factors guide the Court's determination of whether a particular use of force is reasonable: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by fight." *Id.* at 397.

When the Court reviews these factors, it must consider "the totality of the circumstances facing [a police officer] at the time [he] made [his] split-second judgment[] immediately prior to using deadly force." *Chappell*, 585 F.3d at 909. "The relevant time for the purposes of this inquiry is the moment immediately preceding the shooting." *Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007). In other words, "it is the reasonableness of the 'seizure' that is the issue, *not the reasonableness of the [officers'] conduct in time segments leading up to the seizure*." *Chappell*, 585 at 909 (emphasis added).

Here, application of the three *Graham* factors to the unrefuted facts and eye-witness accounts compels the conclusion that Merrow did not use excessive for in violation of the Fourth Amendment. First, the "crime at issue," at the moment

Merrow discharged his weapon, was a relatively serious one. When Merrow shot Alexander, Alexander was attempting to flee in his car (1) after Merrow had ordered him to stop and Alexander ignored these commands, (2) after Alexander resisted Merrow's attempts to open his car door and control the steering wheel, and (3) while Merrow was being dragged alongside Alexander's vehicle. Under these circumstances, Alexander's offense – fleeing and eluding – created a serious risk of injury. Indeed, "[w]hen a motorist disobeys an officer and flees in his car…that person creates a conspicuous potential risk of injury to pedestrians, vehicles sharing the road…and the pursuing officer." *United States v. Martin*, 378 F.3d 578, 582 (6th Cir. 2004). "By making a deliberate choice to disobey a police officer, the motorist provokes an inevitable, escalated confrontation with the officer." *Id.* "*Such a confrontation inherently presents the serious potential risk of physical injury* because the feeling driver intent on his goal of eluding the officer faces the decision of whether to dispel the officer's interference or yield to it." *Id.* at 583 (internal punctuation omitted; emphasis added). That is especially true where, as here, the fleeing driver resists the officer's orders to stop driving, prevents the officer from taking control of the vehicle, and continues to drive away while the officer is being dragged along the side of the car, where he is at high risk for severe injury.

Second, for all of the reasons described in detail above, Alexander's posed an immediate and substantial threat to both Merrow and others. Merrow testified that as he was being dragged on the side of Alexander's car, he was "scared to death" that Alexander was about to "run [him] over." (Merrow Dep. *at* 29, ECF #21-1 at 9, Pg. ID 377.) In addition, Davis, a civilian tow-truck driver who witnessed the events that led to Alexander's death, declared in an unrebutted affidavit that after Alexander began fleeing, it "appeared [Alexander was] heading right at [Davis]." (Davis Decl. at ¶6.) Davis believed Alexander was going to "intentionally side-swipe the van [Davis] was driving." (*Id.*) Where, as here, "the record shows [an] officer[] had probable cause to believe [the suspect] posed a serious threat, the[] use of deadly force [is] constitutionally permissible." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 403 (6th Cir. 2015) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Finally, it cannot be disputed that, at the time he was killed, Alexander was attempting to evade Merrow by fight. Thus all three *Graham* factors support Merrow's invocation of qualified immunity.

The Estate counters that Alexander committed only "minor traffic violations," and Merrow's use of deadly force was thus unconstitutionally excessive. (*See* Estate Br., ECF #21 at 7, Pg. ID 359.) But at the time Merrow discharged his weapon and shot Alexander, Alexander had done much more than

13

just drive without a seatbelt or fail to use his turn signals. He disobeyed Merrow's orders to stop his car, resisted Merrow's attempts to take control of the steering wheel, and continued to drive away, placing Merrow – who was being dragged along the side of Alexander's moving car – in serious danger of being run over or struck by another vehicle. Alexander was *not* shot because he committed minor traffic infractions; he was shot because he put Merrow's life in jeopardy and he resisted Merrow's numerous other attempts to stop him from driving away.

Next, the Estate argues that Merrow could have conducted himself differently during the traffic stop, and had he done so, Alexander's death could have been prevented. (*See, e.g., id.* at 9, Pg. ID 361.) In support, the Estate cites the following portion of Merrow's deposition testimony:

> Q: You could have let him go and tried to pull him over again, couldn't you?
>
> A: Yeah, absolutely. If---

(*Id.*) (quoting Merrow Dep. at 34, ECF #21-1 at 11, Pg. ID 379.) But this testimony does not help the Estate.

First, it is clear that the portion of Merrow's response on which the Estate relies is incomplete. The Estate's attorney cut Merrow off before Merrow was able to give a full answer. Second, while Merrow conceded that he wished he had acted differently, when Merrow's comments are read in their full context, it becomes clear that Merrow (1) was referring to perhaps taking different steps during the

portion of the stop that preceded the shooting and (2) never wavered from his testimony that at the moment he fired the shots, he had no other options:

> Q: You could have just let him go and tried to pull him over again; couldn't you?
>
> A. Yeah, absolutely. If –
>
> Q: I mean it just seems to me this is -- you know, the vehicle is clean. There's nothing -- there's no drugs in there. This is an ordinance violation at best, and I just can't comprehend how someone could make a decision to use deadly force under those circumstances.
>
> A: Well, I think if you go back, and I mean I've thought it about it for three years now, different things of we could have done differently, and I'm sure you could give me, you know, a ton of different things of what I could have done such as this right here. The bottom line is that my initial reaction was I was trying to get him to rear-end the car in front of me. It didn't happen that way. He overpowered me, the vehicle moved out there, I lost my footing, and it was too late to go back and try and start over again. *That vehicle was dragging me, and the only alternative means I had was to shoot Mr. Alexander to stop that car so I wouldn't get run over.*

(Merrow Dep. at 34-35, ECF #21-1 at 11, Pg. ID 379) (emphasis added.)

Moreover, even if Merrow made errors in judgment during the portion of the traffic stop that preceded the shooting – if, for example, his decision to grab the

15

steering wheel was ill-advised[2] – an officer who uses deadly force to protect himself or others against an immediate threat of serious physical harm may *not* be held liable on the ground that he "acted recklessly in creating the circumstances which required the use of deadly force." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007). In the excessive force context, the question is "*not* whether it was reasonable for the police to create the circumstances" that led to the use of force. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (emphasis added). Rather, the issue is whether the officer's actions were objectively reasonable "at the time [he] made [his] split-second judgment[] immediately prior to using deadly force." *Chappell*, 585 F.3d at 909. Here, Merrow's actions at the moment he shot Alexander were objectively reasonable.

The Estate further argues that Alexander was a "neutralized person" and was "non-violent, and non-threatening when he attempted to drive away." (Estate Br. at 11, 14, Pg. ID 366.) But the evidence before the Court belies both of these claims. As described above, Alexander was far from "neutralized." He was actively disobeying Merrow's clear and direct orders to stop fleeing and was attempting to drive away from the scene. And he was a threat to both Merrow – who was being dragged along the side of Alexander's car – and civilians who were sharing the road with Alexander.

---

[2] To be clear, the Court has not concluded that Merrow erred in grabbing the wheel.

16

Finally, the Estate has made two other arguments that are directly refuted by the evidence in the record. First, in both its brief, and again at oral argument, the Estate claimed that "Merrow acknowledged in his deposition that Alexander was travelling at a low rate of speed prior to being shot." (*Id.* at 8, Pg. ID 360.) The Estate attempts to use this testimony as evidence that Merrow was not really in danger, and thus, the degree of force he used was unreasonable.

But Merrow made so such "acknowledgment." In fact, on the very page of his deposition transcript on which the Estate relies, Merrow unequivocally stated *twice* that he did not know how fast Alexander's car was going at the time he discharged his weapon:

> Q. How fast was the car traveling when you were holding on to the door?
>
> A. *I don't know how fast the car was going.*
>
> Q. Under five miles an hour?
>
> A. *I don't know how fast the car was going* but I do know that I was no longer able to backpedal and that I lost my footing and my legs were being drug [sic] on the side of that car.

(Merrow Dep. at 33, ECF #21-1 at 10, Pg. ID 378) (emphasis added.)

Second, the Estate maintained that Merrow was never "'dragged down' Harper Avenue'" by Alexander's car and that a "close analysis of the witness testimony appears to tell a very different story." (Estate Br. at 8, 15, Pg. ID 360,

17

367.) But the Estate cites no evidence that would support such a conclusion. And it is contrary to all of the available evidence in the record. Merrow testified repeatedly that he was "dragged" along the side of Alexander's car. (*See, e.g.*, Merrow Dep. at 29, 30, 33, 34, 35, and 38, ECF #21-1 at 9-12, Pg. ID 377-80.) Merrow's testimony in this respect is unrefuted. And, in stark contrast to the Estate's reading, the "witness testimony" confirms Merrow's insistence that he was dragged down Harper Avenue by Alexander. (*See* Tanner Decl. at ¶7 ("I observed Mr. Alexander driving off down Harper Avenue, with Sgt. Merrow being dragged along the side of the car"); Matthews Decl. at ¶5 ("I observed Alexander attempting to drive away, while dragging Sgt. Merrow outside of the vehicle down Harper Avenue"); Cann Decl. at ¶4 ("I saw a police officer being dragged down Harper by a car"); and Davis Decl. at ¶6 ("Suddenly, the driver started to pull away from the curb. He took off down Harper Avenue, dragging Sgt. Merrow along side of the car").)

  Simply put, the Estate has presented no evidence that creates a genuine issue of material fact on the excessive force question. Merrow is therefore entitled to qualified immunity.

18

## CONCLUSION

The events surrounding Alexander's death were tragic. Nonetheless, for the reasons stated above, Merrow is entitled to summary judgment on Alexander's sole-remaining claim in this action. Accordingly, **IT IS HEREBY ORDERED** that the Motion (ECF #18) is **GRANTED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: April 14, 2016


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 14, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113